IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| **Mathew Whitest**, et al., <br><br>    Plaintiffs, <br><br>  vs. <br><br> **Crisp County School District**, et al., <br><br>    Defendants. | Case No. 1:17-cv-109-LAG <br><br><br> **Whitest Plaintiffs' Motion for Summary Judgment** |

Plaintiffs Mathew Whitest and Curtis Lucas (hereinafter the "Whitest" plaintiffs"), respectfully move the Court for summary judgment as to liability on their claim under Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301. The Crisp County School District and the Crisp County Board of Elections and Registration do not contest liability and have stipulated to the material facts necessary to establish liability. If summary judgment is granted, the Court should then adopt a remedial process, described below, to resolve any issues as to the appropriate remedy.

## BACKGROUND

This is an action, brought in 2017, challenging the at-large method of electing members of the Board of Education in Crisp County, Georgia. The Whitest plaintiffs are African Americans, registered voters, and residents of Crisp County. There are also five *pro se* plaintiffs led by Mr. Crandall Postell (hereinafter the "Postell plaintiffs"), who are also African Americans, registered voters, and residents of Crisp County. The defendants are the Crisp County School District, the current members of the Crisp County Board of Education, and the Crisp County Board of Elections and Registration, which is responsible for conducting elections of members of the Board of Education.

The Board of Education consists of six members elected at large to staggered six-year terms. Elections are partisan and are held at the November general election in even-numbered years. A majority vote is required for election. The Whitest plaintiffs claim that the at-large method of electing members of the Board of Education dilutes Black voting strength in violation of Section 2 of the Voting Rights Act.

African Americans make up 39 percent of Crisp County's voting-age population and 40.7 percent of its registered voters. White residents

are 58 percent of the county's voting-age population and 52.8 percent of its registered voters. The county's African-American population is concentrated in and around Cordele, the county seat, and African Americans in Crisp County are sufficiently numerous and geographically compact that they could constitute a majority of the voting-age population in two or more single-member districts for the election of members of the Board of Education.

Voting in elections for members of the Board of Education is polarized along racial lines. Black voters are politically cohesive in support of their preferred candidates, and white voters tend to support different candidates. A white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education.

There is no dispute as to liability in this case. In January of this year, the Whitest plaintiffs and the defendants agreed to settle this case through a proposed consent order. This Court denied the parties' joint motion for entry of the consent order, however, finding that the parties' proposed remedy would abrogate the rights of the Postell plaintiffs, who have expressed a preference for a different remedy. The Whitest

3

plaintiffs, the school board, and the board of elections now seek an expeditious ruling on liability so that the remedial process can begin and a remedy can be in place for the 2022 elections.

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment has the initial burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, a party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material. *Id*. A factual dispute is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining whether a genuine issue of material fact exists, a court must view the evidence in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Id.* at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

## DISCUSSION

The basic legal framework governing the plaintiffs' claim is well settled. Section 2 of the Voting Rights Act prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority, including what is known as "vote dilution" through the use of at-large elections. *See Gingles*, 478 U.S. at 43-51; *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1224-26 (11th Cir. 2000) (en banc); *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1288-89 (11th Cir. 2020); Ga. *State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). The essence of a vote-dilution claim is that a particular election practice "interacts with social and historical conditions … to minimize or cancel out the voting strength of racial minorities in the voting population." *Gingles*, 478 U.S. at 47-48 (cleaned up).

In *Gingles*, the Supreme Court identified three preconditions for a vote-dilution claim under Section 2. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically

compact to constitute a majority in a single-member district." *Id.* at 50. "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51. "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (cleaned up). If a plaintiff meets that initial threshold, Section 2 then requires the court to determine, based on a review of the "totality of circumstances," whether the challenged practice results in unequal electoral opportunity for minority voters. 52 U.S.C. § 10301(b); *see Gingles*, 478 U.S. at 79; *Johnson v. De Grandy*, 512 U.S. 997, 1010-12 (1994).

The legislative history of Section 2 indicates that "a variety of factors, depending upon the kind of rule, practice, or procedure called into question" can be relevant when making the totality-of-circumstances determination. Senate Report at 28-29. The Senate Report on the 1982 amendments to the Voting Rights Act identifies seven factors that are typically relevant to a vote-dilution claim. These so-called "Senate Factors" are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* In addition, the Senate Report identified two other factors that have had "probative value" and that are often considered alongside with the other factors, namely:

> Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]
>
> Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29. The Supreme Court expressly approved and applied the Senate-Factor analysis in *Gingles*, but it pointed out that there is no requirement that any particular number of the Senate factors be proved, or that a majority of them point one way or the other. 478 U.S. at 43-45; *accord Wright*, 979 F.3d at 1289; *Ga. State Conf. of the NAACP*, 775 F.3d at 1342.

Since the Supreme Court decided *Gingles*, courts have recognized at least two additional factors that may be probative of vote dilution. The first additional factor is "proportionality," *i.e.*, whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *De Grandy*, 512 U.S. at 1000, 1014 n.11; *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006). The second additional factor is racial separation. "[O]n-going racial separation … —socially, economically, religiously, in housing and business patterns—makes it

9

especially difficult for [minority] candidates seeking county-wide office to reach out to and communicate with the predominantly white electorate from whom they must obtain substantial support to win … at-large elections." *United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 291 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004); *see also United States v. City of Euclid*, 580 F. Supp. 2d 584, 592-93 (N.D. Ohio 2008).

Although the Supreme Court has made clear that the district courts must perform this totality-of-circumstances analysis, "[e]stablishment of the *Gingles* preconditions presages Section 2 liability." *Charleston Cty.*, 316 F. Supp. 2d at 277. This is because the establishment of the *Gingles* preconditions "creates the inference the challenged practice is discriminatory." *Sanchez v. Colorado*, 97 F.3d 1303, 1310 (10th Cir. 1996). Indeed, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Ga. State Conf. of the NAACP*, 775 F.3d at 1342.

Here, again, there is no dispute as to liability. The school board and board of elections have stipulated to the existence of the three

*Gingles* preconditions. They have stipulated to several Senate Factors. And they have stipulated that the at-large method of election lacks proportionality. Based on the totality of these circumstances, the plaintiffs have shown that Black voters in Crisp County have less opportunity than white voters to elect candidates of their choice to the Board of Education. This violates Section 2, and the plaintiffs are therefore entitled to judgment as a matter of law.

## REMEDY

It is black-letter law that, "wherever practical," a federal court should give elected officials an opportunity to remedy an unlawful election plan. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). This rule is rooted in the political nature of redistricting, a feature that is thought (in most cases) to render the elected branches preferable to the judiciary for mapmaking purposes. *See, e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 749 (1973) ("[T]he apportionment task, dealing as it must with fundamental 'choices about the nature of representation' . . . is primarily a political and legislative process."). But this rule is not absolute and not without exception, "such as when the timing of an upcoming election makes legislative action impractical." *Georgia State Conf. of the NAACP*

*v. Fayette County Bd. of Comm'rs*, 996 F. Supp. 2d 1353 (N.D. Ga. 2014). This exception recognizes the irreparable harm that results if an election goes forward under an unlawful plan. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 585 (1964) ("[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."). Thus, a federal court may—and ordinarily should—give elected officials a first crack at devising a remedy, but it need not do so if timing or other circumstances make that impractical.

An "opportunity" to redistrict, moreover, need not be unlimited. It can be quite brief. In *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), for instance, after finding North Carolina's congressional plan unconstitutional due to racial gerrymandering, the court "require[d] that new districts be drawn within two weeks of the entry of this opinion." *Id.* at 627. In *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (per curiam), after determining that Georgia's state legislative plans were malapportioned, the court gave Georgia's elected branches nineteen days to enact new maps.

One further principle is relevant to the timing of any remedy: the Court may not adopt a remedial plan for a violation of Section 2 of the Voting Rights Act "without determining whether the plan complie[s] with Section 2 of the Voting Rights Act." *Edge v. Sumter County Sch. Dist.*, 775 F.2d 1509, 1510 (11th Cir. 1985) (per curiam). As a result, the Court may not simply rubber-stamp any plan enacted or proposed by elected officials. Instead, the Court must review the plan to determine whether it provides the full and complete remedy required by Section 2. *See United States v. Dallas County Comm'n*, 850 F.2d 1433, 1441-42 (11th Cir. 1988); *Dillard v. Crenshaw County*, 831 F.2d 246, 250 (11th Cir. 1987). *See, e.g., Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1038-40 (D.S.D. 2005); *Dillard v. Baldwin County Bd. of Educ.*, 686 F. Supp. 1459, 1469-70 (M.D. Ala. 1988). This means that any remedial procedure must include time for the Court to review and evaluate proposed plans, even if those plans are enacted or proposed by legislative actors.

With these principles in mind, the Whitest plaintiffs propose the following remedial procedures for use if the Court grants summary judgment. These procedures are similar to those used in other cases,

13

and they account for the critical fact that, in Georgia, school-board district lines are drawn by the General Assembly.

1. The Court should immediately order the parties to confer and to file a joint report within two weeks identifying a date certain by which a remedy or an interim remedy would need to be in place in order for elections to proceed in 2022 under a new election plan.

2. The Court should also order the school board and the board of elections to confer with Crisp County's legislative delegation to determine whether the General Assembly can address the issue of remedy in time for the 2022 elections and, if so, when that might take place. The next regular session of the General Assembly is scheduled to begin in January 2022, but there may be one or more special sessions held before then for the purpose of decennial redistricting. The Court should order the school board and the board of elections to report back to the court within two weeks. Other parties should be permitted one week to respond to any such report. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1372-74 (N.D. Ga. 2016), *aff'd* No. 16-11689 (11th Cir. 2017) (per curiam).

3. The Court should then determine whether and, if so, how long, to give the General Assembly to devise a lawful remedy subject to pre-implementation review by the Court. If the Court determines, however, that the General Assembly is unlikely to devise a lawful remedy in time for the 2022 elections, then this Court should begin the process of devising its own interim remedy for use until superseded by legislative enactment.

4. If the Court determines that an interim remedy might be necessary, the Court should invite all parties to submit remedial proposals along with any evidence necessary to support those proposals. Other parties should have an opportunity to respond, and there should also be an opportunity to reply. The Court could then adopt a remedy based on the papers or hold a hearing for further argument and, if necessary, the presentation of further evidence. The Court may, but is not required to, adopt a proposal submitted by one of the parties.

5. If, after reviewing the parties' proposals, the Court determines that none of them are acceptable remedies, the Court also has the option of drawing its own interim remedy. *See, e.g., Wright v. Sumter Cnty. Bd. of Elections and Registration*, 2020 WL 499615 (M.D.

Ga. Jan. 29, 2020). This is most often done with the assistance of a special master. But this option should only be a last resort because court-drawn plans are invariably time-consuming and expensive.

Dated: July 8, 2021

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

**Sean J. Young**
Georgia Bar No. 790399
American Civil Liberties Foundation of Georgia, Inc.
P.O. Box 77208
Atlanta, Georgia 33057
Telephone: (770) 303-8111
Email: syoung@acluga.org

**Dale E. Ho**
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 284-7332
Email: dho@aclu.org

*Attorneys for the Whitest Plaintiffs*

# Certificate of Service

I hereby certify that I have filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of the filing to the following attorneys of record:

Phillip L. Hartley: phartley@hhhlawyers.com
Hieu N. Nguyen: hnguyen@hhhlawyers.com
Frank B. Strickland: fstrickland@taylorenglish.com
Bryan P. Tyson:  btyson@taylorenglish.com
Loree Ann Paradise: lparadise@taylorenglish.com


I further certify that I have served the foregoing document by U.S. Mail on the following non CM/ECF participants:

Crandall Postell
311 1st Avenue West
Cordele, GA 31015

Kenya Williamson
505 South 14th St
Cordele, GA 31015

George Whitehead, Jr
505 South 14th St
Cordele, GA 31015

Sarah Williamson
505 South 14th St
Cordele, GA 31015

Betty Jean Williamson
305 24th Ave West Apt E
Cordele, GA 31015

Dated: July 8, 2021

**/s/ Bryan L. Sells**
*Attorney for the Whitest Plaintiffs*